CASE NO. 16-4091, 16-4098

---

IN THE UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

UTAH REPUBLICAN PARTY,

Plaintiff-Appellant,

UTAH DEMOCRATIC PARTY,

Intervenor Plaintiff and Cross-Appellant,

v.

SPENCER J. COX, in his official capacity as Lieutenant Governor of Utah,

Defendant-Appellee.

---

On Appeal From The United States District Court For The District of Utah, Central
Division, The Honorable David Nuffer, District Judge
D.C. No. 2:16-cv-00038-DN

---

**APPELLANT'S REPLY BRIEF**

---

MARCUS R. MUMFORD
405 South Main Street, Suite 975
Salt Lake City, Utah 84111
Telephone: (801) 428-2000
Email: mrm@mumfordpc.com
*Attorney for Plaintiff-Appellant Utah
Republican Party*

Oral Argument Requested

April 20, 2017

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

ARGUMENT .........................................................................................1

   I.    The URP's Position Does Not Contradict "50 Years Of Supreme Court Precedent." ........................................................................................1

   II.   Those "Interests" Forming The Basis Of The State's "Weighing" Analysis Are Entirely Court-Made And Contrary To The Evidentiary Record. .........8

   III.  The District Court Violated Summary Judgment Standards In Dismissing The URP's Invidious Discrimination Claims. .............................................13

   IV.  SB54's Signature Gathering Requirements Are Unconstitutional. ............15

   V.   The State's Judicial Estoppel Arguments Are Misplaced and Unavailing. .......................................................................................18

   VI.  The State's and UDP's Preclusion and Claim Splitting Arguments Violate Fed. R. App. P. 28(i) and the Cross Appeal Rule and Should Be Disregarded. ....................................................................................25

CERTIFICATE OF COMPLIANCE ........................................................28

CERTIFICATE OF DIGITAL SUBMISSION .......................................29

CERTIFICATE OF SERVICE ................................................................30

i

## Cases

*American Party of Texas v. White,*
  415 U.S. 767 (1974)............................................................................ 6

*Anderson,*
  460 U.S. ................................................................................................ 11

*BanInsure, Inc. v. FDIC,*
  796 F.3d 1226 (10th Cir. 2015) ...................................................... 20, 23

*Bernstein v. Bankert,*
  733 F.3d 190 (7th Cir. 2013) ............................................................. 26

*California Democratic Party v. Jones,*
  530 U.S. 567 (2000)..................................................................... 2, 6, 7

*Castenada v. JBS USA, LLC,*
  819 F.3d 1237 (10th Cir. 2016) .......................................................... 27

*Clingman v. Beaver,*
  544 U.S. 581 (2005)........................................................................ 3, 4

*Coffaro v. Crespo,*
  721 F.Supp.2d 141 (E.D.N.Y. 2010) ................................................... 24

*Democratic Party of U.S. v. Wisconsin ex rel. La Follette,*
  450 U.S. 107 (1981)..................................................................... 7, 8, 9

*Edenfield v. Fane,*
  507 U.S. 761 (1993)............................................................... 11, 12, 15

*Hoffenberg v. United States,*
  2010 WL 3083533 (D. Ariz. Aug. 6, 2010) ....................................... 24

*Hutchinson v. Pfeil,*
  105 F.3d 562 (10th Cir. 1997) ............................................................ 23

*Jarvis v. Nobel/Sysco Food Servs. Co.,*
  985 F.2d 1419 (10th Cir. 1993) ..................................................... 26, 27

*Jenness v. Fortson,*
  403 U.S. 431 (1971)....................................................................... 5, 6

*LaRouche v. Kezer,*
  990 F.2d 36 (2d Cir. 1993) ................................................................. 16

*Libertarian Party of Florida v. State of Florida,*
  710 F.2d 790 (11th Cir. 1983) ....................................................... 17, 18

*Libertarian Party of Ohio v. Blackwell,*
  462 F.3d 579 (6th Cir. 2006) ............................................................. 11

*New York State Bd. of Elections v. Lopez Torres,*
  552 U.S. 196 (2008)..................................................................... 2, 4, 7

*Pegram v. Herdrich,*
  530 U.S. 211 (2000)............................................................. 21
*Queen v. TA Operating, LLC,*
  734 F.3d 1081 (10th Cir. 2013) ................................... 18, 19
*Reed Elsevier, Inc. v. Muchnick,*
  559 U.S. 154 (2010)...................................................... 21, 22
*Reform Party of Allegheny County v. Allegheny County Dep't of Elections,*
  174 F.3d 305 (3d Cir. 1999) ............................................. 11
*S.J. Groves & Sons Co. v. Fulton County,*
  967 F.Supp. 501 (N.D. Ga. 1996)..................................... 24
*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011)...................................................... 22, 23
*United States v. Pakala,*
  568 F.3d 47 (1st Cir. 2009).............................................. 24
*Zedner v. United States,*
  547 U.S. 489 (2006)...................................................... 21, 24

## ARGUMENT

### I.   The URP's Position Does Not Contradict "50 Years Of Supreme Court Precedent."

The Supreme Court has stated in no uncertain terms that "[a] political party has a First Amendment right … to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform." *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 202-03 (2008). Likewise, "our cases vigorously affirm the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party 'select[s] a standard bearer who best represents the party's ideologies and preferences.'" *California Democratic Party v. Jones*, 530 U.S. 567, 575 (2000) (citations omitted). While these rights can be "circumscribed" in certain circumstances, they cannot be entirely abolished, as the State would have this Court hold. *Lopez Torres*, 552 U.S. at 203.

The State mischaracterizes URP's arguments in this respect. Nowhere does URP argue that "the First Amendment requires Utah *not* to hold a primary election." Aplee's Br. 24 (emphasis in original). The URP is not arguing that primary elections are *per se* unconstitutional. Rather, the URP has a First Amendment right "to choose a candidate-selection process," and though this right can be "circumscribed," it cannot be entirely disregarded. *Lopez Torres*, 552 U.S.

1

at 202-03. URP's argument is exactly what Justice Stevens foresaw in his dissent

in *Jones*:

> It is arguable that, under the Court's reasoning combined with *Tashjian*,
> the only nominating options open for the States to choose *without party
> consent* are: (1) not to have primary elections, or (2) to have what the
> Court calls a "nonpartisan primary"… [which] is not actually a
> 'primary' in the common, partisan sense of that term at all.

*Jones*, 530 U.S. at 598 n.8 (Stevens, J. dissenting) (emphasis added). Indeed, that

was the state of Utah before SB54, where the State provided a primary for its

citizens, and left it up to the political parties to say whether and how they wanted

to participate in that primary. Op. Br. at 3-10, 15-16.

In other words, the State cannot force URP to nominate its candidates

exclusively by primary elections "without party consent." As URP explained in its

Opening Brief, "the Supreme Court has never held that a state can mandate how a

party chooses between a *primary or convention* or force a party to accept a primary

as the exclusive means of picking its candidates." Aplt's Br. 33 (emphasis in

original). That is exactly what Justice Stevens confirmed in dissenting from

*Tashjian* and *Jones*.

In response, the State cites *Clingman v. Beaver*, *Jenness v. Fortson*,

*American Party of Texas v. White*, and *Burdick v. Takushi* to assert that "[t]he

Supreme Court has 'repeatedly upheld state laws *actually imposing* a primary

election requirement … where a party disagreed with the primary's rules." App'ee

2

Br. 25. But in *Clingman*, unlike here, the only burden on a party's rights was that "Oklahoma merely prohibits the [LPO or Libertarian Party of Oklahoma] from leaving the selection of its candidates to people who are members of another political party." *Clingman v. Beaver*, 544 U.S. 581, 587-88 (2005). The lawsuit was brought by "Republican and Democratic voters who … do not want to associate" with the LPO, i.e., become a member, but did want "to assist in selecting the Libertarian Party's candidates for the general election." *Clingman*, 544 U.S. at 588. The Supreme Court rejected the efforts of those non-members to bring an associational rights challenge against that law, ruling that individuals who cannot be bothered to join organizations whose rights are at issue cannot assert violations of constitutional rights in that regard. *Id*. Contrary to the State's suggestion, *Clingman* never held that a state can "hijack" a party's First Amendment rights or that it can mandate a primary election as the exclusive means for a party to nominate its standard bearer. *Clingman* also never held that, once mandated, the State must also be given power to control and direct how political parties execute that legislative mandate. The State is bootstrapping the "flexible" standard in *Burdick* beyond the breaking point to suggest such things. And the contrast in this case and how *Clingman* was presented only shows why the purported interests of the state have not and cannot overcome the burdens SB54 is placing on URP, and also why strict scrutiny should apply.

3

And the State is completely mistaken to cite *Jenness* as supporting its position. There was never an issue in *Jenness* over whether the state of Georgia could mandate its preferred primary election scheme over a political party's right "to choose a candidate-selection process that will in its view produce the nominee who best represents its political platform." *Lopez Torres*, 552 U.S. at 202-03. Indeed, *Jenness* did **not** involve any effort by candidates to get on **a party's primary ballot**. To the contrary, the ballot access at issue in *Jenness* concerned the right of non-political party candidates to access the **general election ballot**. As the opinion itself begins:

> Under Georgia law a candidate for elective public office **who does not enter and win a political party's primary election** can have his name printed on **the ballot at the general election** only if he has filed a nominating petition signed by at least 5% of the number of registered voters at the last general election for the office in question.

*Jenness v. Fortson*, 403 U.S. 431, 432 (1971) (emphasis added). The plaintiffs in that case were challenging a state law that limited access to the general election ballot in the case of *independent* or "*political body*" (which was lesser than a political party) candidates to only those who could gather signatures from 5% of registered voters in support of their effort. The plaintiffs were not challenging any state law on grounds that it mandated a primary election, or on grounds that the law gave power to the state to direct how a party would select candidates in that mandatory primary regardless of a party's internal procedures.

4

The *Jenness* appellants attacked Georgia's nominating-petition requirements on two different but related points:

> First, … to require a **nonparty candidate** to secure the signatures of a certain number of voters before his name may be printed on the ballot is to abridge the freedoms of speech and association guaranteed to that candidate and his supporters by the First and Fourteenth Amendments. Secondly, … when Georgia requires a **nonparty candidate** to secure the signatures of 5% of the voters before printing his name on the ballot, yet prints the names of those candidates who have won nomination in party primaries it violates the Fourteenth Amendment by denying the nonparty candidate the equal protection of the laws.

*Jenness*, 403 U.S. at 434 (emphasis added). The *Jenness* opinion cannot be the basis to say whether a state can impose a primary, without a party's consent, then later control how that primary is run to maintain its exclusive control on the candidate-selection process. Accordingly, the State's reliance on *Jenness* is misplaced.

In *White*, as in *Jenness*, a challenge was made to the method in which candidates **qualified for the general election ballot**, as opposed to how candidate qualified for **a political party's primary ballot**. *See American Party of Texas v. White*, 415 U.S. 767, 772 (1974) ("Under the laws challenged in this case, four methods are provided for nominating candidates to the ballot for the general election."). Indeed, the appellants in *White* "assert[ed] that these preconditions for access to the general election ballot are impermissible burdens on [Constitutional] rights." *Id*. at 779-80 (emphasis added). While the Texas election scheme at issue

provided that major party candidates "may be nominated by primary election only," the appeal only involved the rights asserted by minority parties, their candidates and their supporters. *See id*. at 770. No one ever challenged the mandatory primary requirement. Indeed, it appears that the major political parties supported and did not oppose the law that was being challenged. *Jones*, 530 U.S. at 598 n.8 (Stevens, J. dissenting) (emphasis added).

Finally, in *Burdick*, an individual voter sought to force a write-in requirement into Hawaii's election scheme. The case had nothing to do with whether the state of Hawaii could disregard a political party's right "to choose a candidate-selection process." *Lopez Torres*, 552 U.S. at 202-03.

So the State is wrong to argue that "50 years of Supreme Court precedent" support its denial. The State has selectively cited a few inapposite cases, which it purports to construe as something that they are not. In doing so, the State lost sight of the issue in this appeal: whether the State can burden URP's right to choose its candidate selection process without a commensurate interest? As Justice Stevens rightly observed, in the wake of *Jones* and *Tashjian*, the State cannot force URP to nominate by primary elections "without party consent." *Jones*, 530 U.S. at 598 n.8 (Stevens, J. dissenting). Nothing offered by the State contradicts that formulation.

The State cites to *La Follette* for the proposition that the Supreme Court employs a "laser- like focus on who is choosing the party's candidates—and

6

whether the party wanted those voters' participation." Aplee's Br. 31 (emphasis in original). Essentially, the State is trying to use the *La Follette* case for this proposition that URP cannot challenge "how URP's candidates are nominated". Aplee's Br. 33 (emphasis in original). But the State's reliance on *La Follette* is misplaced, as the case fully supports URP's position.

The question in *La Follette* was whether Wisconsin may "bind the National [Democratic] Party to honor the binding primary results, even though those results were reached in a manner contrary to National Party rules." *Democratic Party of U.S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 120 (1981). Stated differently, "[t]he issue [was] whether the State may compel the National Party to seat a delegation chosen in a way that violates the rules of the Party." *Id*. at 121. Or, "whether the State has compelling interests that justify the imposition of its will upon the [political party]." *Id*. at 124. To all of these questions, the Supreme Court answered "no". In the end, *the La Follette* Court did not "strike down" Wisconsin's law, as the State claims. See Aplee's Br. 31. Rather, the Court observed how Wisconsin's and the National Party's "interest are not incompatible". Id. at 126. On the one hand, "National Party rules do not forbid Wisconsin to conduct an open primary." *Id*. On the other hand, "if Wisconsin does open its primary" it cannot bind the National Party to the results "if to do so would violate Party rules." *Id*. In

other words, the National Party's rules could not be displaced by the state's desire to conduct primary elections.

Similarly, the State did not address the URP's use of the *Cousins v. Wigoda* case. The URP explained in its December 3 Letter to the Lieutenant Governor, detailed in its Opening Brief, how that case instructs states to defer to a political party's choice of a candidate-selection process. See Aplt's Br. 11-13. This principle was also supported in cases cited by the URP like *Clements v. Fashing*, and Utah cases like *Clegg v. Bennion* and *Anderson v. Cook*. See Aplt's Br. 11.

Just as in *La Follette*, *Cousins*, and the other authority cited, the URP has argued that the State cannot impose its will on URP in how URP chooses its standard bearer. URP's rules dictate that its nominees be chosen by convention. Even if the State has a compelling interest in conducting primaries, which Wisconsin did in *La Follette*, the State cannot force URP to accept candidates in violation of party rules.

## II. Those "Interests" Forming The Basis Of The State's "Weighing" Analysis Are Entirely Court-Made And Contrary To The Evidentiary Record.

There appears to be a significant procedural misunderstanding that must be addressed, as it permeates the entirety of the district court's analysis and is now presented without skepticism in the briefs of the State. It is this: the URP based its motions for summary judgment on an evidentiary record that included, inter alia: (1) the testimony of Utah's Director of Elections, Mark Thomas, on behalf of the

State's defense of SB54 – Mr. Thomas testified as to what interests SB54 served and what the State had no interest in when it came to SB54; (2) an undisputed record of what Utah legislators said when they were debating and voting for SB54 – this is the true record of the State's "interests" and motivations were in enacting the law; (3) an undisputed record of what the URP identified as its interests burdened by SB54, both in terms of the caucus and convention system of nominating candidates that preceded SB54, and in the party's internal candidate-selection rules and procedures.

The State repeatedly argues that URP failed to show how any of its constitutional rights are being burdened, after the court struck the unaffiliated voter provision from SB54 following the First Lawsuit, and that any remaining burden imposed by SB54 is completely "justified by the important, nondiscriminatory State interests in managing elections in a controlled manner, increasing voter participation, and increasing access to the ballot." App'ee Br. 19. The State would have this Court adopt the district court's statements regarding how SB54 "fulfill[ed] important state regulatory interests," including "managing elections in a controlled manner, increasing voter participation, and increasing access to the ballot." But, as authority for its statements, the district court could only cite sections of the Utah election code that preexisted SB54. (JA1171)

First, the district court's incorporation of these statutory provisions as the state interests it must "weigh" in granting summary judgment to the State regarding the constitutionality of SB54 is misleading. As an example, in support of its April 15, 2016 ruling, p.3 n.14, the district court cited to Utah Code § 20A-9-401, as authority for the "purposes" of SB54, that section, § 20A-9-401(1), stating that Part 4 of Chapter 9 of the Election Code "shall be construed liberally so as to ensure full opportunity for persons to become candidates and for voters to express their choice." First, that provision was enacted in 1994 and not part of the state's interests in enacting SB54. More importantly, the district court failed to acknowledge subsection (2) from that same section states, in a manner contrary to the entirety of the State's position in this case: "This part may not be construed to govern or regulate the internal procedures of a registered political party." *Id.* § 20A-9-401(2). It is as if the State's syllogism is as follows:

➢ We can impose a primary on a political party,

➢ **<u>And therefore</u>**, in so doing, we are acting in furtherance of important State interests,

➢ **<u>And therefore</u>**, we should also be able to direct the actions of any political party who must participate in that primary that we are imposing,

10

> ➤ **And therefore**, any argument about the burden our law imposes on
> URP is "ethereal."

Full stop. When it comes to the actual "interests" of the State, it must make a

clear argument and presentation regarding the precise interests that are protected

by the action in question, and it cannot rely on "generalized and hypothetical

interests identified in other cases." *Libertarian Party of Ohio v. Blackwell*, 462

F.3d 579, 593 (6th Cir. 2006) (citing *Reform Party of Allegheny County v.*

*Allegheny County Dep't of Elections*, 174 F.3d 305, 315-16 (3d Cir. 1999),

*Anderson*, 460 U.S. at 789, and *Edenfield v. Fane*, 507 U.S. 761, 768 (1993)

(ruling that courts cannot "supplant the precise interests put forward by the State

with other suppositions" in evaluating restrictions on commercial speech under the

Central Hudson test)).

But that is not even what the State's own law says about its interests. Utah

Code § 20A-9-401(2) does not say that the State can dismiss any burden that its

laws impose on a political party as "ethereal." To the contrary, it commands the

State to not "govern or regulate the internal procedures of a registered political

party." Id. Here, the State has admitted that SB54 displaces URP's candidate-

selection procedures. When the State refuses to comply with the mandate of its

own laws in furtherance of new laws, such as SB54, what recourse does a political

party have, if not the federal courts to address the situation?

11

Perhaps even more importantly, the district court's formulation of the "interests" that it "weighed" against the burdens of SB54 is actually contrary to the factual record of the case. And as URP showed in this case, those were not the true and accurate statements of what motivated the actual legislators of Utah in passing SB54 into law. (AA369-72, 376)

Recall that this appeal comes following the district court's rulings, pursuant to Fed. R. Civ. P. 56(f), where it not only denied URP's two motions for summary judgment, which were supported by a factual record, but granted summary judgment to the State on the facts presented. Under binding summary judgment standards, the district court should not have dismissed URP's evidence, granting summary judgment against URP. But the district court plainly ignored the evidence presented by the URP.

The facts presented by the URP showed, among other things, the State admitting that it did not have the "interests" in doing what the State now says it can do. Mr. Thomas testified contrary to these interests, admitting that it did not have interests in voter participation, that it did not have any interest in URP's internal candidate selection procedures, and that its only interest in providing access to the ballot is that set forth in the Utah Code. The URP showed its injuries, and supported its motions with facts. The district court, and now the State, sometimes in the most condescending manner, has dismissed and overridden those injuries

12

with selectively-chosen "interests" unrelated to SB54. That is not proper, even under *Burdick*. And the State never developed an evidentiary record of any so-called State "interests" that it might assert in this case.

### III. The District Court Violated Summary Judgment Standards In Dismissing The URP's Invidious Discrimination Claims.

Continuing with the point made in the preceding section and Opening Brief, it becomes even more apparent that the district court misapplied the proper summary judgment standard when we consider how the district court and State have dismissed URP's invidious discrimination arguments. Though acknowledging URP's correct statements of the law, the district court quickly dismissed URP's argument, claiming that "URP has not shown evidence of animus." JA1184. The district court could only have reached that conclusion by ignoring URP's statement of facts in which it alleged, with evidentiary support, how the Lieutenant Governor was targeting URP and how lawmakers and Count My Vote "specifically targeted [URP] and its rights with SB54." JA454-55. When the Utah legislators spoke of increasing "voter participation," they were talking about making Utah elections "more competitive," which they could do if they disadvantaged the URP. These points were further analyzed in URP's summary judgment arguments in which URP explained how SB54 "was enacted to produce [URP] nominees for elected office who will represent different 'priorities' and 'views' than the political view

of [URP] and its members and to make [URP]'s winning candidates less responsive and accountable to [URP] and its Platform." JA462-63.

Under binding summary judgment standards, the district court could not simply dismiss URP's evidence as "nonsensical" because "[a] majority of the members of the Utah Legislature are members of the URP and it is hard to believe that they would target their own party or the viewpoints their party advances." JA1184. The district court's decision must rest on evidence, not its own assumptions and speculation about what URP members would or would not do. In this case, the district court plainly ignored the evidence before it. This is also true of the district court's statement that "URP fails to show how SB54 applies differently to the URP than to other QPPs." Id. URP is the dominant political party in Utah and URP presented evidence that SB54 was enacted with URP specifically in mind. This included evidence that, even after its enactment, the Lieutenant Governor was solely targeting URP and its internal rules and processes. JA454-55, 461-62.

One more point here: the State now argues that the URP's argument that it was "targeted" with SB54 "makes no sense." App'ee Br. 17. After all, the State and district court point out, SB54 was enacted by a majority-Republican legislature. They would have this Court conclude that URP is fabricating the entirety of its case against SB54. At times, it seems everyone is getting a good

14

laugh at how absurd it is for the URP to challenge the election law its own members voted for. But anyone laughing has not watched any political news over the last several years, which inevitably will include stories about the expanding rift between a party's "grassroots" and its "establishment." The State seems to suggest that SB54 will bring "order" to "chaos" – but only an out-of-touch government bureaucrat would dismiss the grassroots interests of the URP with a snub about letting them eat cake. Chaos? Yes, to incumbents the URP's caucus and convention system may seem chaotic. But that does not give the State a right or compelling interest to squash that "chaos" like a bug with an autocratic demand for "order."

## IV.    SB54's Signature Gathering Requirements Are Unconstitutional.

There is no dispute that SB54's signature gathering requirements exceed any threshold ever allowed by the Supreme Court. *See* Aplee's Br. 42 (acknowledging the district court's finding that "[t]hose percentages were '*all* above 5%, which is the highest percentage approved in any of the cases cited by the parties.'") Yet the State claims that this unconstitutional provision of SB54 can be cured based on the Second Circuit case *LaRouche v. Kezer*. Aplee's Br. 41. The State is wrong.

The *LaRouche* court recognized that even under the totality test, "if a ballot qualification statute were wholly irrational–a coin flip test, for example–it would not be saved by the presence of additional valid-access methods." *LaRouche v.*

*Kezer*, 990 F.2d 36, 38 n.1 (2d Cir. 1993). URP has already explained at length how SB54's signature gathering scheme is "utterly irrational and not reasonably calculated to serve any purpose". *See* Aplt's Br. 43-45. While the district court speculated at length as to what the State Legislature's purposes were in imposing arbitrary numerical requirements, it cited to no evidence in support of its speculation, because there was none. *See* JA954-955. Summary judgment must be based on evidence, not the district court's unfounded speculation. And at the end of the day, the evidence before the district court showed that the wide variance in percentages from district to district was akin to a "coin-flip test", without rhyme or reason.

Not surprisingly, the State claims that SB54 is not "wholly irrational" by simply citing to the district court's "realistic means" finding. *See* Aplee's Br. 42. This Court should not be persuaded.

Relying on the Eleventh Circuit's decision in *Libertarian Party of Florida v. State of Florida*, the district court claimed that SB54's signature gathering scheme was not wholly irrational. JA952-53. But the district court's reliance on *Libertarian Party of Florida* is misplaced. As the district court itself acknowledged, the *Libertarian Party of Florida* case is distinguishable because it "analyzed whether a numerical requirement of signatures was the 'least drastic means'", which is not at issue in this case. JA952. Perhaps more importantly, the

16

*Libertarian Party of Florida* case is further distinguishable because unlike SB54, the Florida ballot access law did not impose an arbitrary number, but rather a 3% requirement, which is less than the 5% threshold established by Supreme Court precedent. *See Libertarian Party of Florida v. State of Florida*, 710 F.2d 790, 793 (11th Cir. 1983). Likewise, unlike SB54, Florida's ballot access law included provisions "that ease a party's ability to obtain signatures." *Id*. at 794. These included at least the following: (1) "[t]he Florida Election Code places no restrictions on who can sign a petition"; (2) Florida does not "preclude a voter from signing a petition if he or she has previously signed that of another party"; and (3) "[t]here are no geographical limitations on the numbers of signatures which can be gathered from a certain area. A party can thus concentrate its petition efforts in populated areas." *Id*. But SB54 is the exact opposite. Only registered Republican voters can sign a petition, they can only sign for one party, and signatures can only be gathered from within the petitioner's district. Unlike the Florida ballot access law, SB54's signature requirements do not provide a "realistic means" of access. It does not matter that "that there are at least some URP candidates who have successfully met the signature requirements". JA953. At the very least, summary judgment was not appropriate on the issue and the district court's dismissal of URP's arguments as an "attempt[] to create a dispute of material fact" shows

17

further how the district court did not draw reasonable inferences in URP's favor as it was required to do. *See* JA953.

## V.  The State's Judicial Estoppel Arguments Are Misplaced and Unavailing.

First, the State claims that URP's judicial estoppel argument can be "quickly dispatch[ed]…because URP does not even address the three reasons why the district court rejected it." Aplee's Br. 46. The State is wrong.

With respect to judicial estoppel determinations made on summary judgment, this Court has explained that <u>first</u>, "we view the facts and all reasonable inferences to be drawn therefrom in a light most favorable to the nonmoving party." *Queen v. TA Operating, LLC*, 734 F.3d 1081, 1086 (10th Cir. 2013). <u>Second</u>, "[a]ssuming the district court has properly characterized the facts in light of the applicable standard, we then review its decision [on judicial estoppel] only for an abuse of discretion." *Id*. URP specifically argued in its Opening Brief that "[w]hile the district court correctly cited to the judicial estoppel factors, *it misapplied the facts of this case*" and "*the district court did not draw reasonable inferences in the URP's favor*". Aplt's Br. 49 (emphasis added). In other words, the district court's "three reasons" are not entitled to any deference, and do not need to be specifically addressed by URP, precisely because the district court failed to "properly characterize[] the facts in light of the applicable standard". *Queen*, 734 F.3d at 1086.

Furthermore, the district court only addressed one element of judicial estoppel, the "inconsistent position" factor, to which the abuse of discretion standard attaches. *See* JA945 ("Because the first factor…is not satisfied, URP has failed to carry its burden"). And, contrary to the State's assertion, URP did in fact address the "inconsistent position" factor in its Opening Brief. *See* Aplt's Br. 49-50. The State's inconsistent positions were also detailed at length in URP's Statement of Facts. Aplt's Br. 7-10.

The district court's other reasons, that judicial estoppel does not apply to positions of law, and that judicial estoppel is not properly asserted on summary judgment, are purely legal questions. *See* JA945. URP's judicial estoppel argument should not be "dispatched" simply because URP did not raise the district court's erroneous legal determinations, which are accorded no deference and are reviewed by this Court *de novo*.

Second, the State argues that URP's judicial estoppel argument was properly rejected because it involves inconsistent positions of *law* and not *fact*. Aplee's Br. 46-47. The district court was wrong in this respect and so is the State; Supreme Court decisions show that the doctrine of judicial estoppel applies with equal force to positions of law and fact.

In *BancInsure, Inc. v. FDIC*, this Court acknowledged "that other courts have applied the doctrine of judicial estoppel to positions of law, not merely

19

positions of fact." *BanInsure, Inc. v. FDIC* , 796 F.3d 1226, 1240 n.9 (10th Cir. 2015). And even though "the greater weight of federal authority…supports the position that judicial estoppel applies to a party's stated position, regardless of whether it is an expression of intention, a statement of fact, or a legal assertion", the *BancInsure* court declined to extend judicial estoppel to positions of law "absent en banc consideration or an intervening Supreme Court decision". *Id*. In this respect, the *BancInsure* court relied on Tenth Circuit decisions that "post-date *New Hampshire*", including *United States v. Villagrana-Flores*, *Kaiser v. Bowlen*, and *Johnson v. Lindon City Corp. See BancInsure*, 796 F.3d at 1240. But those decisions only go through 2006. The *BancInsure* court apparently did not consider the fact that beginning in 2006, the Supreme Court has issued at least three decisions in which the Court analyzed judicial estoppel with respect to changing legal positions.

In *Zedner v. United States*, the Court explained how judicial estoppel "prevents a party from prevailing in one phase of a case on an *argument* and then relying on a contradictory *argument* to prevail in another phase." *Zedner v. United States*, 547 U.S. 489, 504 (2006) (citing *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000) (emphasis added). One of the "positions," or arguments, considered by the *Zedner* Court was purely legal: whether prospective "waivers of the [Speedy Trial] Act are enforceable". *Id*. Essentially, the defendant in that case had taken the

20

legal position that rights under the Speedy Trial Act can be waived prospectively, only to change his position and move for dismissal. And in fact, the *Zedner* Court found that "clear inconsistency" was likely present with respect to the defendant's change in legal position; the Court only declined to apply judicial estoppel because "Petitioner did not succeed in persuading the District Court" to accept his position and because the government actually "accepted the District Court's *interpretation* without objection." *Id*. at 505 (emphasis added).

In *Reed Elsevier, Inc. v. Muchnick*, the Court again considered judicial estoppel with respect to a purely legal position: "that copyright registration was jurisdictional". *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 169 (2010). Indeed, the *Reed* Court characterized the operative "position" as "invoking…binding Circuit precedent that supported their clients' positions." *Id*. at 170. And the Court explained how "the District Court did not adopt petitioners' *interpretation of § 411(a) as jurisdictional*." *Id*. Clearly, a legal position was at issue. But while the *Reed* Court declined to apply judicial estoppel, its determination had nothing to do with the fact that the underlying "position" was one of law. Rather, the Court ultimately declined to apply judicial estoppel because the petitioner had not persuaded the district court to accept its legal position. *See id*.

Finally, in *Sorrell v. IMS Health Inc.*, the Court raised issue with the fact that the State of Vermont advocated for the first time at oral argument "an

21

alternative reading of § 4631(d)". *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563

(2011). In other words, the State changed its legal position on appeal. Relying on

*New Hampshire v. Maine* and the doctrine of judicial estoppel, the *Sorrell* Court

explained how "[i]t might be argued that the State's newfound interpretation comes

too late in the day" and how "respondents, the District Court, and the Court of

Appeals were entitled to rely on the State's plausible *interpretation of the law* it is

charged with enforcing." *Id*. (emphasis added). Of particular application to the

instant case, the Court explained that "[f]or the State to change its position is

particularly troubling in a First Amendment case, where plaintiffs have a special

interest in obtaining a prompt adjudication of their rights, despite potential

ambiguities of state law." *Id*.

While this Circuit may have previously refused to apply judicial estoppel to

positions of law, the foregoing Supreme Court decisions, together with "the greater

weight of federal authority," now make clear that this Court's prior decisions in

that respect are no longer valid. *See BancInsure*, 796 F.3d at 1240 n.9. Indeed, this

Court cannot continue to limit judicial estoppel to positions of fact where the

Supreme Court has not hesitated to analyze judicial estoppel arguments based on

positions of law. Surely the Supreme Court would not suggest that judicial estoppel

bars a state's changing "interpretation of the law" if the doctrine only applies to

positions of fact, as the district court and the State erroneously claim. *See Sorrell*, 564 U.S. at 563.

Third, the State argues that URP's judicial estoppel arguments were properly rejected "because the doctrine is an affirmative defense, not an individual cause of action" and because it is apparently "incorrect to seek summary judgment on judicial estoppel as if it were an independent cause of action". Aplee's Br. 47. The State is wrong. This Court has made clear that parties "may use a motion for summary judgment to test an affirmative defense which entitles that party to judgment as a matter of law." *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997). Thus, inasmuch as the State claims that "URP is incorrect to seek summary judgment on judicial estoppel" merely because it is an affirmative defense, its argument must fail.

The State also appears to argue that URP could not invoke judicial estoppel because URP was the plaintiff and the State "alleged no counterclaims against which URP could have raised judicial estoppel as an affirmative defense." Aplee's Br. 47. The State misunderstands the law. As the Supreme Court described the doctrine: judicial estoppel "prevents *a party* from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Zedner*, 547 U.S. at 504 (emphasis added). The doctrine is not exclusive to defendants or counterclaim-defendants but applies to any "party" that asserts

23

inconsistent positions in legal proceedings. And in fact, courts routinely invoke the

doctrine of judicial estoppel to bar defendants, as opposed to plaintiffs, from

asserting inconsistent positions. *See, e.g.*, *United States v. Pakala*, 568 F.3d 47, 60

(1st Cir. 2009) (judicial estoppel barred defendant from asserting an inconsistent

position in his motion to dismiss); *Coffaro v. Crespo*, 721 F.Supp.2d 141, 145-46

(E.D.N.Y. 2010) (judicial estoppel barred defendant from asserting position

inconsistent with position taken in prior bankruptcy proceeding); *S.J. Groves &*

*Sons Co. v. Fulton County*, 967 F.Supp. 501, 503 (N.D. Ga. 1996) ("this court

applied Georgia principles of judicial estoppel to prevent Defendants from arguing

contrary positions in two suits"); *Hoffenberg v. United States*, No. CV-08-08164-

PCT-FJM, 2010 WL 3083533, at *6 (D. Ariz. Aug. 6, 2010) (unpublished)

("doctrine of judicial estoppel would also bar defendant from unfairly taking any

inconsistent position in a future judicial proceeding.")

The district court erred when it allowed the State to assert in the First

Lawsuit that URP could qualify as a QPP, even if it only permitted nomination by

convention, only to change its position in written letters and this lawsuit, claiming

that, as a QPP, URP "must allow candidates to collect signatures." JA88. At the

very least, there was a disputed issue of fact and the district court should not have

rejected URP's judicial estoppel arguments on summary judgment.

**VI.    The State's and UDP's Preclusion and Claim Splitting Arguments
Violate Fed. R. App. P. 28(i) and the Cross-Appeal Rule and Should Be
Disregarded.**

According to the State, its Response Brief "contains 12,931 words,"

approximately 70 words shy of the 13,000-word limit prescribed by Rule 32(a)(7).

In an attempt to stay in compliance with Rule 32, the State purports to incorporate

arguments made by the Utah Democratic Party in its cross-appeal pursuant to Rule

28(i), Federal Rules of Appellate Procedure, rather than making the arguments

itself. *See* Aplee's Br. 47-48. Specifically, the State claims that "UDP correctly

argues that those doctrines provide *alternative grounds to affirm* the district court's

judgments". Aplee's Br. 47 (emphasis added). The State's (and UDP's) preclusion

and claim splitting arguments are improper and should be disregarded for at least

two reasons.

First, nothing in Rule 28(i) authorizes the State to incorporate arguments

made by an opposing party in a cross-appeal. The rule applies to cases "involving

more than one appellant or appellee, including consolidated cases" and even then,

the rule states that "any number of appellants *or* appellees may join in a brief".

Fed. R. App. P. 28(i) (emphasis added). Here, there is an appeal, Case No. 16-

4091, and a cross-appeal, Case No. 16-4098. Both have *one* appellant and *one*

appellee. Though the two appeals are related, URP is not aware of them ever

actually being consolidated. Furthermore, the plain meaning of Rule 28(i) is that

appellants may join in the briefs of other appellants *or* appellees may join in the briefs of other appellees. Nothing in the rule allows for an appellee in one appeal to incorporate the arguments of an appellant in a cross-appeal. The State's incorporated arguments should be disregarded for this reason alone.

Second, UDP's arguments on cross-appeal, which are incorporated by the State, violate the "cross-appeal rule" and should be disregarded. In *Bernstein v. Bankert*, the Seventh Circuit specifically rejected the argument that "a conditional cross-appeal is a permissible way to hedge against an adverse finding on the main appeal." *Bernstein v. Bankert*, 733 F.3d 190, 224 (7th Cir. 2013). As the *Bernstein* court explained, "cross-appeals are not appropriate in routine cases like ours that raise only alternate grounds for affirmance of the judgment and not an independent issue." *Id.*; *see also Jarvis v. Nobel/Sysco Food Servs. Co.*, 985 F.2d 1419, 1426 n.7 (10th Cir. 1993) (dismissing cross-appeals where "a prevailing party urges an alternate ground in support of the judgment that the trial court rejected"); *Castenada v. JBS USA, LLC*, 819 F.3d 1237, 1247 (10th Cir. 2016) ("alternative grounds for affirmance were not properly raised as a cross-appeal"). Here, the State characterizes the preclusion and claim splitting arguments in UDP's cross-appeal as "*alternative grounds to affirm* the district court's judgments". Aplee's Br. 47 (emphasis added). In other words, the State concedes that the very arguments it purports to incorporate are not properly before this Court and should

26

be disregarded.

As an appellee, the State may argue that alternate grounds support the district court's judgment. *See Jarvis*, 985 F.2d at 1426 n.7. But the State did not make those arguments; rather, in an effort to avoid the 13,000-word limit, the State purported to rely on Rule 28(i), which is inapplicable, and sought to incorporate arguments improperly raised in UDP's cross-appeal. The State's incorporated arguments should be disregarded, especially where this Court's rules make clear that "[i]ncorporating by reference [is] disapproved." 10th Cir. R. 28.4.

In the event the Court actually considers UDP's preclusion and claim splitting arguments, the arguments fail.

Dated this 20th day of April, 2017.

/s/ Marcus R. Mumford
Marcus R. Mumford
Attorney for Appellant
405 S. Main Street, Suite 975
Salt Lake City, Utah 84111
mrm@mumfordpc.com
(801) 428-2000

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation because it is 6,394 words excluding those parts of the brief that are exempt by local rule.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 14 point Times New Roman font.

Date: April 20, 2017.

/s/ Marcus R. Mumford
Marcus R. Mumford
Attorney for Appellant
405 S. Main Street, Suite 975
Salt Lake City, Utah 84111
mrm@mumfordpc.com
(801) 428-2000

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Windows Defender, last updated April 20, and according to the program are free of viruses.

/s/ Marcus R. Mumford
_____

{signature of counsel}

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2017, I electronically filed Appellant's Reply Brief using the court's CM/ECF system, which will send notification of such filing to the following:

Tyler R. Green
350 N. State Street, Suite 230
Salt Lake City, Utah 84114
(801) 538-9600
tylergreen@utah.gov

Peter W. Billings
Charles A. Stormont
David P. Billings
FABIAN VANCOTT
215 S. State Street, Suite 1200
Salt Lake City, Utah 84111
pbillings@fabianvancott.com
cstormont@fabianvancott.com
dbillings@fabianvancott.com

Clemens A. Landau
ZIMMERMAN JONES BOOHER
Felt Building, Fourth Floor
341 South Main Street
Salt Lake City, Utah 84111
clandau@zjbappeals.com

Date: April 21, 2017.

/s/ Marcus R. Mumford
Marcus R. Mumford
Attorney for Appellant
405 S. Main Street, Suite 975
Salt Lake City, Utah 84111
mrm@mumfordpc.com
(801) 428-2000